UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BRITTANY P. CAUDILLO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CIV-15-761-M |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff Brittany P. Caudillo brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§ 401-434, 1381-1383f. United States District Judge Vicki Miles-LaGrange has referred this matter to the undersigned for initial proceedings consistent with 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure. The Commissioner has answered and filed the administrative record (Doc. No. 12, hereinafter "R. _"). The parties have briefed their positions, and the case is ready for decision. For the reasons stated herein, it is recommended that the Commissioner's decision be reversed and remanded.

PROCEDURAL HISTORY AND ADMINISTRATIVE DECISION

Plaintiff protectively filed applications for DIB and SSI on February 14, 2012. R.

156-69, 179. Plaintiff alleged a disability onset date of January 1, 2009. R. 156, 163. Following denial of her applications initially and on reconsideration, a hearing was held before an Administrative Law Judge ("ALJ") on December 13, 2013. R. 28-64, 84-98, 102-07. In addition to Plaintiff, a vocational expert testified at the hearing. R. 28-64. The ALJ issued an unfavorable decision on March 13, 2014. R. 7-27.

The Commissioner uses a five-step sequential evaluation process to determine entitlement to disability benefits. *See Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009); 20 C.F.R. §§ 404.1520, 416.920. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2009. R. 12. At step two, the ALJ determined that Plaintiff had the severe impairments of: leg length discrepancy; ankylosis;[1] Klippel-Trenaunay Syndrome;[2] organic mental disorders; affective disorders; and anxiety-related disorders. R. 12. At step three, the ALJ determined that Plaintiff's condition did not meet or equal any of the presumptively disabling impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). R. 12-15.

---

[1] Ankylosis is the "[s]tiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint." *Stedman's Medical Dictionary* 95 (28th ed. 2006).

[2] Klippel-Trenaunay Syndrome (also called Klippel-Trenaunay-Weber Syndrome) is a condition that affects the development of blood vessels, soft tissues, and bones and is associated with overgrowth of bones and soft tissues (usually in one limb) and with malformation of veins. *Id.*; Nat'l Insts. of Health: Nat'l Library of Med., *Klippel-Trenaunay Syndrome* (2010), https://ghr.nlm.nih.gov/condition/klippel-trenaunay-syndrome.

The ALJ next assessed Plaintiff's residual functional capacity ("RFC") based on all of her impairments. R. 15-20. The ALJ found that Plaintiff had the RFC to perform "less than a full range of light work":

> [Plaintiff] is able to lift/carry up to ten pounds frequently, twenty pounds occasionally, with equivalent pushing/pulling capacity. She can stand/walk for two hours at fifteen-minute intervals. She can sit four to eight hours in an eight-hour workday. She is limited to occasional climbing of stairs, ropes, ladders, scaffolding. She can occasional[ly] bend or stoop, kneel, crouch, or crawl. She is limited to performing simple work tasks involving superficial contact with coworkers and supervisors, and no public contact.

R. 15. The ALJ determined at step four that Plaintiff had no past relevant work. R. 20.

At step five, the ALJ considered whether there are jobs existing in significant numbers in the national economy that Plaintiff—in view of her age, education, work experience, and RFC—could perform. R. 20-21. Taking into consideration the vocational expert's testimony regarding the degree of erosion to the unskilled light occupational base caused by Plaintiff's additional limitations, the ALJ concluded that Plaintiff could perform unskilled occupations such as clerical mailer, circuit board assembler, and machine operator, and that such occupations offer jobs that exist in significant numbers in the national economy. R. 21. Therefore, the ALJ concluded that Plaintiff had not been disabled within the meaning of the Social Security Act during the relevant time period. R. 21.

Plaintiff's request for review by the Appeals Council was denied. R. 1-5. The unfavorable determination of the ALJ stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481.

STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is limited to determining whether factual findings are supported by substantial evidence in the record as a whole and whether correct legal standards were applied. *Poppa v. Astrue*, 569 F.3d 1167, 1169 (10th Cir. 2009). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (internal quotation marks omitted). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Branum v. Barnhart*, 385 F.3d 1268, 1270 (10th Cir. 2004) (internal quotation marks omitted). The court "meticulously examine[s] the record as a whole," including any evidence that may undercut or detract from the administrative law judge's findings, to determine if the substantiality test has been met. *Wall*, 561 F.3d at 1052 (internal quotation marks omitted). While the court considers whether the Commissioner followed applicable rules of law in weighing particular types of evidence in disability cases, the court does not reweigh the evidence or substitute its own judgment for that of the Commissioner. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008).

ANALYSIS

On appeal, Plaintiff argues that the ALJ committed legal error by failing to evaluate the opinions of Plaintiff's treating physician, Raha Nael, MD, in accordance with the "treating physician rule." *See* Pl.'s Br. (Doc. No. 14) at 12-21; Pl.'s Reply Br. (Doc. No.

23) at 1-9.[3]

### A. The Treating Physician Rule

Specific SSA regulations govern the consideration of opinions by "acceptable medical sources." *See* 20 C.F.R. §§ 404.1502, .1513(a), 416.902, .913(a). The Commissioner generally gives the highest weight to the medical opinions of a "treating source," which includes a physician or psychologist who has "provided [the claimant] with medical treatment or evaluation" during a current or past "ongoing treatment relationship" with the claimant. *Id.* §§ 404.1502, .1527(c), 416.902, .927(c); *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).

When considering the medical opinion of a claimant's treating physician, the ALJ must first determine whether the opinion should be given "controlling weight" on the matter to which it relates. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The opinion of a treating physician is given such weight if it is both well-supported by medically acceptable clinical or laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. *Watkins*, 350 F.3d at 1300 (applying SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996)); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

A treating physician opinion not afforded controlling weight is still entitled to deference. *See Watkins*, 350 F.3d at 1300; SSR 96-2p, 1996 WL 374188, at *4. "In many cases, a treating source's medical opinion will be entitled to the greatest weight and

---

[3] With the exception of the administrative record, references to documents electronically filed by the parties use the page numbers assigned by the Court's ECF system.

should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. That an opinion is not given controlling weight does not resolve the second, distinct assessment—i.e., what lesser weight should be afforded the opinion and why. *See Watkins*, 350 F.3d at 1300-01. In this second inquiry, the ALJ weighs the relevant medical opinion using a prescribed set of regulatory factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins*, 350 F.3d at 1301 (internal quotation marks omitted); 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

The ALJ's decision "'must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Watkins*, 350 F.3d at 1300 (quoting SSR 96-2p, 1996 WL 374188, at *5). If an ALJ rejects a treating source opinion altogether, he or she "must then give specific, legitimate reasons for doing so." *Id.* at 1301 (internal quotation marks omitted).

B. *The Relevant Record*

Plaintiff's medical record reflects that she was treated by and at the direction of Dr. Raha Nael, a vascular specialist at Oklahoma Heart Hospital ("OHH") in Oklahoma City, multiple times between December 2012 and October 2013. *See* R. 816-19, 820-31, 850-64,

882-909.

On December 11, 2012, Plaintiff reported to Dr. Nael her condition of Klippel-Trenaunay Syndrome "with left sided hypertrophy and varicose veins/[arteriovenous] malformation." R. 817-19 (Ex. 22F). Plaintiff complained of swelling in her left leg, with "lower extremity swelling and pain with prolonged standing, ambulation, legs in dependent position, which improves minimally with rest and elevation." R. 817. Dr. Nael advised Plaintiff to wear Class II compression hose and "to elevate lower extremities." R. 819. Dr. Nael stated that she would "obtain complete venous duplex [ultrasound] to evaluate for superficial and deep venous reflux and presence of [arteriovenous] malformation." R. 819.

On February 6, 2013, a bilateral lower extremity venous ultrasound was completed upon Dr. Nael's order. R. 825-31 (Ex. 23F). The radiologist noted a vascular mass on Plaintiff's left Achilles tendon that possibly represented an arteriovenous malformation, as well as evidence of deep vein and superficial vein insufficiency in both lower extremities. R. 830-31. That same day, Dr. Nael opined that the ultrasound demonstrated evidence of an arteriovenous malformation in the left posterior ankle as well as "significant" superficial venous reflux in both lower extremities. R. 828. Dr. Nael stated under "Plan": "Continue aggressive conservative therapy," "including elevation." R. 828.

On February 8, 2013, Dr. Nael noted that she had discussed Plaintiff's condition with another physician and requested that an MRI be performed upon Plaintiff's left ankle. R. 825. A later note in the record stated: "Patient has had multiple orthopedic surgeries. Patient states she has metal screws and pins in her foot and ankle, therefore patient is not able to have an MRI." R. 825. Plaintiff was instead scheduled for a CT scan of her left

7

lower extremity. R. 825.

This CT scan was ordered by Dr. Nael and performed on March 6, 2013. R. 820-24 (Ex. 23F). The radiology report noted "abnormal-appearing vascular enhancement within and adjacent to the Achilles tendon," with "associated enlargement of the tendon as well as some slight decreased central attenuation," but "no associated draining vein to suggest arteriovascular malformation." R. 823. The reviewing physician concluded that these findings were "most consistent with a focal hemangioma."[4] R. 824. Also noted was "a very atretic"—i.e., closed or absent—"proximal left posterior tibial artery with absence of the mid to distal left posterior tibial artery." R. 824.

On April 4, 2013, Plaintiff was admitted by Dr. Nael to Mercy Hospital and underwent an arteriogram of her lower left extremity. R. 851-58 (Ex. 25F). The radiologist's report noted that the vascular lesion in Plaintiff's left ankle was resected 10 or 12 years ago but "[t]here was reason to believe it has, at least to some extent, recurred." R. 856; *see also* R. 503-09 (records of surgical excision of hemangioma around Plaintiff's left Achilles tendon in 1999). The arteriogram showed that "[t]he posterior tibial artery is occluded. There is compensatory hypertrophy of the interosseous artery a branch of which, at the ankle, appears to opacify what may represent a posteriorly located recurrent or persistent hemangioma." R. 857. "The anterior tibial artery is patent throughout but slightly small." R. 857.

On May 3, 2013, Dr. Nael again referred Plaintiff for admission to Mercy Hospital.

---

[4] A hemangioma is a vascular tumor "in which proliferation of blood vessels leads to a mass that resembles a neoplasm." *Stedman's Medical Dictionary* 861 (28th ed. 2006).

R. 859-64 (Ex. 25F).  There Plaintiff underwent an embolization procedure in which a small amount of Onyx, a liquid embolic agent, was inserted into a hypertrophied tributary of a small abnormal arterial branch in an attempt to occlude the vessels to the hemangioma.  R. 863-64.

On July 10, 2013, an arterial duplex ultrasound at OHH showed a hypoechic mass in the posterior left ankle at the site of the previous hemangioma.  R. 899-905 (Ex. 27F).  On that same day, Dr. Nael noted that the ultrasound demonstrates "minimal flow" and "significant superficial venous reflux in the bilateral lower extremities."  R. 902.  Dr. Nael prescribed Plaintiff both Neurontin and ketoprofen cream for her pain.  R. 902.  Dr. Nael also noted under "Plan": "[C]ontinue aggressive conservative therapy," to include "elevation" and Class II compression hose.  R. 902.

On October 7, 2013, a venous duplex ultrasound of Plaintiff's right leg was performed at OHH, reflecting evidence of "significant venous reflux" both in the great saphenous vein extending from the sapheno-femoral junction (near the groin) to below the knee and in a tributary of that vein.  R. 885, 888.  Following that ultrasound Dr. Nael performed a radiofrequency ablation and foam schlerotherapy procedure upon Plaintiff's right leg.  R. 885-898 (Ex. 27F).  Plaintiff's postoperative diagnosis was "venous insufficiency with inflammation."  R. 885.  A follow-up ultrasound a few days later found no evidence of obstructive thrombus on the right side but continued to reveal a heterogeneous vascular mass on Plaintiff's left ankle.  R. 883 (Ex. 27F).

At the hearing in December 2013, Plaintiff testified that her Klippel-Trenaunay Syndrome causes  the left side of her body to be larger than her right side and causes pain

and problems with her blood vessels. R. 43. She stated that her left leg is worse than her right but that they both hurt every day. R. 44. Plaintiffs testified that if she sits too long, her legs go numb and swell, resulting in pressure and pain. R. 46, 55. Plaintiff stated that when that happens, she has to lie down to relieve the pressure and then can get up and return to what she was doing. R. 46, 56. Plaintiff also testified regarding the twice-removed blood tumor on her left ankle and the effects of the screws in her left knee from a separate growth-plate surgery. R. 42, 47-49. Plaintiff testified that she spends about 50 percent of her day in a recliner with her legs up because otherwise her lower body starts to swell because of her vein issues. R. 56.

*C. Discussion*

In determining at step three that Plaintiff had no impairment or combination of impairments that met or equaled a Listing, the ALJ noted that Plaintiff "had a history of juvenile treatment" for Klippel-Trenaunay Syndrome, and that an ultrasound of her lower extremities was performed in 2010. The ALJ did not mention Dr. Nael's extensive treatment of Plaintiff for continued problems from this impairment. R. 12-13; *see* R. 496-502 (records reflecting a 2002 screw epiphysiodesis surgery aimed at correcting leg-length discrepancy); R. 503-22 (records of 1999 surgical excision of hemangioma around Plaintiff's left Achilles tendon); R. 523-39 (record of normal lower-extremity ultrasound in 2010); R. 816-19, 820-31, 850-64, 882-909 (Exs. 22F, 23F, 25F, 27F). The ALJ noted Plaintiff's report that she "spends most of her time in a recliner with her crural extremities elevated." R. 14.

The ALJ cited additional records in evaluating Plaintiff's RFC. The ALJ noted

records in which past surgeries to Plaintiff's left ankle and knee were mentioned, R. 16, and stated that Plaintiff "appears to have had two separate procedures and/or surgeries on her ankle," R. 17 (citing Ex. 25F).[5] The ALJ additionally identified some of the findings reflected in the 2012-2013 records of Plaintiff's treatment for Klippel-Trenaunay Syndrome with Dr. Nael. R. 17 (citing Exs. 22F, 23F, 25F, 27F).

What the ALJ does not do, however, is recognize the records issued by Dr. Nael and her colleagues as those of physicians who had a treatment relationship with Plaintiff, or assess and weigh these treating physicians' opinions in accordance with *Watkins* and SSR 96-2p. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2); *Watkins*, 350 F.3d at 1300-01. As reflected in the summaries above, these records contain medical opinions of Dr. Nael and her colleagues—i.e., statements "that reflect judgments about the nature and severity of [Plaintiff's] impairment(s)," including "symptoms, diagnosis and prognosis" and Plaintiff's "physical . . . restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2); R. 817-31, 851-64, 882-909 (reflecting physicians' diagnoses, prescribed medications and therapies, and observations of Plaintiff's condition). Because the ALJ's decision "'must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight,'" this failure alone constitutes reversible error. *Watkins*, 350 F.3d at 1300 (quoting SSR 96-2p, 1996 WL 374188, at *5); *see id.* at 1301 ("We cannot simply presume the ALJ applied the correct

---

[5] The ALJ at one point appears to have conflated or confused Plaintiff's previous surgeries, as he erroneously describes the epiphysiodesis procedure performed in 2002 (involving the insertion of screws into the growth plate to address the leg-length discrepancy) as the first surgery undertaken to remove the tumor from Plaintiff's Achilles tendon (which had been performed in 1999). *See* R. 16.

11

legal standards in considering [the treating physician's] opinion. We must remand because we cannot meaningfully review the ALJ's determination absent findings explaining the weight assigned to the treating physician's opinion."); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) ("[F]ailure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." (internal quotation marks omitted)).

Further, Dr. Nael's repeated instruction that Plaintiff elevate her lower extremities supports a functional limitation, specifically proposed by Plaintiff to the Commissioner, *see* R. 56, 62-63, 241, 244, that reasonably could be found to result from Plaintiff's severe impairment of Klippel-Trenaunay Syndrome. The ALJ excluded any leg-elevating requirements from Plaintiff's RFC, and he failed to mention Dr. Nael's express instructions when doing so. *See* R. 15; *cf.* SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996) ("[T]he RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms."). If an ALJ rejects a treating source opinion altogether, he or she must "give specific, legitimate reasons for doing so." *Watkins*, 350 F.3d at 1301 (internal quotation marks omitted). Here, the ALJ's written decision provides no rationale for failing to incorporate limitations consistent with Dr. Nael's instruction into the RFC.

The Commissioner does not directly dispute that the ALJ "failed to articulate the weight, if any," given to the 2012-2013 medical opinions, but argues that the ALJ's decision nevertheless should be upheld based upon its soundness in other aspects. *Watkins*, 350 F.3d

at 1301; *see* Def.'s Br. (Doc. No. 22) at 19-25.  First, the Commissioner argues that the ALJ's treatment of Dr. Nael's opinions was proper because the ALJ stated that he considered "all the evidence" and the "entire record" in reaching his decision.  R. 10, 12; *see* Def.'s Br. at 21.  But the ALJ's mere consideration of evidence does not demonstrate to the Court that the ALJ actually weighed and evaluated that evidence consistently with the treating physician rule, as required for meaningful review.  *See Watkins*, 350 F.3d at 1301; 20 C.F.R. §§ 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."), 416.927(c)(2) (same); *cf. Cox v. Apfel*, No. 98-5203, 1999 WL 820215, at *3 n.2 (10th Cir. Oct. 14, 1999) ("[A] general disclaimer is not a substitute for the ALJ's obligation to give careful consideration to all the relevant evidence and to expressly link his findings to specific evidence.").

Relatedly, the Commissioner argues that the ALJ is not required to discuss every piece of evidence in detail and emphasizes that the ALJ's citations included the relevant Exhibits.  *See* Def.'s Br. at 21.  But the Commissioner's premise is only partially correct: while "an ALJ is not required to discuss every piece of evidence," the ALJ *must* discuss: (i) "the evidence supporting his decision"; (ii) "the uncontroverted evidence he chooses not to rely upon"; *and* (iii) "significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  Even if not subject to the treating physician rule, Dr. Nael's and her colleagues' uncontroverted opinions regarding the effects of Plaintiff's Klippel-Trenaunay Syndrome, including Dr. Nael's repeated instruction to Plaintiff regarding elevation of her legs, would be evidence for which a rejection should be

explained.

Next, the Commissioner argues that Dr. Nael merely "*advised*" Plaintiff to elevate her legs and "did not say that Plaintiff *needed* to elevate her legs." Def.'s Br. at 21; *see* R. 819 ("I have advised her to elevate lower extremities."). *But see* R. 828, 902 (Dr. Nael stating, under the heading "Plan," "Continue aggressive conservative therapy including elevation," with no mention of "advice"). The Commissioner offers no authority for the proposition that a medical doctor's express advisement does not reflect a judgment as to the "nature and severity" of the patient's impairments, restrictions, and optimal course of action. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Nor is it established that "advice" versus "need" is a distinction with a difference in the context of a physician's express instruction regarding a patient's treatment of a severe impairment.

The Commissioner additionally notes that Dr. Nael did not specify the frequency with which Plaintiff needs to elevate her legs. *See* Def.'s Br. at 21. While accurate, the ALJ did not state or indicate that Dr. Nael's lack of a frequency specification in any way affected his evaluation of the relevant opinions, and the Court "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." *Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007). Similarly, the Commissioner suggests that the ALJ could have properly rejected Dr. Nael's opinions because these opinions were allegedly based upon Plaintiff's subjective complaints, which the ALJ found not credible, and the alleged fact that Dr. Nael instructed only "conservative" (but also "aggressive") medical therapy. *See* Def.'s Br. at 21-22. Even if these facts were borne out by the record, there is no whiff of such bases for rejection in the written decision,

14

and the Court may not properly adopt such a post hoc rationalization. *See Haga*, 482 F.3d at 1207-08. Acceptance of this theory would require the Court to speculate in exactly the manner the treating physician rule is designed to avoid. *See Watkins*, 350 F.3d at 1301; *cf. Young v. Colvin*, No. CIV-14-1064-F, 2015 WL 9581397, at *3 (W.D. Okla. Dec. 9, 2015) (R. & R.) (noting that by attempting to reframe the plaintiff's assignment of error as only a credibility issue the Commissioner "conceded that the ALJ erred in failing to address all the medical evidence"), *adopted*, 2015 WL 9480077 (W.D. Okla. Dec. 29, 2015).

Finally, the ALJ's failure to properly evaluate the relevant medical opinions cannot be disregarded as harmless to the step-five determination. At the hearing, the ALJ's first hypothetical inquiry to the vocational expert ("VE") included no leg-elevating requirements. *See* R. 60-61. The VE identified three sedentary, unskilled jobs that the ALJ's hypothetical claimant could perform. *See* R. 61-62. The ALJ then asked the VE whether an individual subject to the limitations reflected in Plaintiff's own testimony would be able to work, and the VE replied in the negative. *See* R. 62-63 (VE testifying that Plaintiff's need to elevate her legs "would prevent sedentary work without some type of accommodation" and that Plaintiff's need to elevate her legs 50 percent of the time and take frequent breaks would prevent competitive employment). Because inclusion of a leg-elevating requirement would effectively prevent Plaintiff from performing any of the three sedentary occupations identified by the ALJ at step five, the ALJ's error in evaluating Dr. Nael's opinions cannot be said to be harmless. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1163 (10th Cir. 2012) (noting that a finding of harmless error may be appropriate when, "based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable

15

administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way" (internal quotation marks omitted)); *cf. Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995) (noting that the inquiry relied upon by the ALJ must include all "impairments borne out by the evidentiary record").

## RECOMMENDATION

Having reviewed the record, the transcript of the administrative hearing, the decision of the ALJ, and the pleadings and briefs of the parties, the undersigned recommends that the decision of the Commissioner be REVERSED and REMANDED for further proceedings.

## NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to file written objections to this Report and Recommendation in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. Any such objections must be filed with the Clerk of this Court by August 23, 2016. The parties further are advised that failure to timely object to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein. *See Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

## STATUS OF REFERRAL

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in this case.

ENTERED this 9th day of August, 2016.

CHARLES B. GOODWIN
UNITED STATES MAGISTRATE JUDGE